UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CAROLINA CONSTANZA ANORGA,                    Case Number:

                              Plaintiff,


              -v-                             **COMPLAINT**
                                              **with JURY DEMAND**

HALSEEN, INC. d/b/a HUMMING HOMES,
ADEEL MALLICK, and KYLE CARNES,

                              Defendants.
-------------------------------------------------------------X


        Plaintiff, CAROLINA CONSTANZA ANORGA ("Plaintiff"), by and through her

attorneys, The Law Offices of William Cafaro, complaining of HALSEEN, INC. d/b/a

HUMMING HOMES (the "Company"), ADEEL MALLICK ("Mr. Mallick"), and Kyle Carnes

("Mr. Carnes") (all together as "Defendants") hereby alleges as follows upon information and belief:

### *NATURE OF THE CASE*


        1.      This is a civil action for damages and equitable relief based on Defendants'

violations of Plaintiff's rights guaranteed to her by the New York City Human Rights Law, Title

8 of the Administrative Code of the City of New York, as amended, including The Local Civil

Rights Restoration Act, effective October 3, 2005, as well Local Laws 1, 34, 35, 36, 37, 38, and

40 of 2016 ("NYCHRL").

        2.      Plaintiff claims that Defendants (her former employers) discriminated against her

on the basis of her gender (sex), race, national origin (and/or immigration status), and ethnicity;

sexually harassed her; subjected her to a continuous and pervasive hostile work environment;

retaliated against her for engaging in protected activity and unlawfully terminated her employment, all in violation of NYCHRL.

## JURISDICTION AND VENUE

3.     Plaintiff alleges jurisdiction is based on upon 28 U.S.C. § 1332, insofar as it involves Defendants who are citizens of New York and a Plaintiff who is not a citizen of New York for the purposes of diversity jurisdiction.

4.     The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

5.     Venue is based upon 28 U.S.C. § 1391(b)(1), insofar as at least one of the Defendants resides within this Judicial District, and (b)(2), insofar as a substantial part of the events giving rise to the within causes of action occurred in this Judicial District.

### *THE PARTIES*

6.     Plaintiff is a citizen of Peru (a country located in South America), who is currently in the USA on a visa.  She lives in Manhattan, New York.

7.     At all times herein pertinent, Plaintiff was a "person" under NYCHRL.

8.     The Company is a foreign business corporation, which was incorporated in the State of Delaware and has a principal place of business located in Manhattan, New York.

9.     Mr. Mallick has a principal place of business located in Manhattan, New York.

10.     Upon information and belief, Mr. Mallick is a citizen of New York State.

11.     Mr. Mallick is the co-founder and Chief Executive Officer ("CEO") of the Company. *See* https://www.linkedin.com/in/adeelmallick/.  Upon information and belief, Mr. Mallick has had final authority and say in all matters concerning the Company and its employees, including but not

limited to hiring and firing practices, promotions and compensation, payroll practices, maintaining employment records, day-to-day activities, and discrimination policies.

12.     Mr. Carnes has a principal place of business located in Manhattan New York.

13.     Upon information and belief, Mr. Carnes is a citizen of New York State.

14.     Mr. Carnes is the co-founder and Chief Operations Officer ("COO") of the Company. *See* https://www.linkedin.com/in/kyle-carnes-93aa2020/.  Upon information and belief, Mr. Carnes has authority and say in all matters concerning the Company and its employees, including but not limited to hiring and firing practices, promotions and compensation, payroll practices, maintaining employment records, day-to-day activities, and discrimination policies

15.     At all times herein pertinent, Defendants were employers as defined by N.Y.C. Admin. Code §8-102(5) and they individually and/or together employed at least (4) persons at all times herein pertinent.

## *MATERIAL FACTS*

16.     According to its website, "Humming Homes" is a technology and a service that empowers homeowners." *See https://humminghomes.com/.*

17.     Sadly, Humming Homes and its CEO and COO do not appear to also be interested in empowering their employees, instead choosing to subject individuals like Plaintiff to reprehensible discrimination and clear-cut retaliation for daring to speak up.

18.     What's more, Defendants apparently exploit foreign laborers in the Philippines, South America, and other impoverished regions around the world by paying them meager wages, with the purpose of increasing the Company's bottom line and lining their pockets.

Our Founders,
Adeel Mallick & Kyle Carnes



19.     Plaintiff is a citizen of Peru (a country in South America ) who is currently in the USA on a visa.

20.     Plaintiff began her employment with Defendants with the explicit agreement that they would immediately secure for her an employer-sponsored work visa, especially a O-1 visa, and bear all legal fees and expenses associated with same.

21.     Taking advantage of Plaintiff's dire need for legal status in the USA and consistent with Defendants' exploitation of foreigners, they advised Plaintiff that, due to her need for an employer-sponsored work visa, her salary would be approximately $30,000 below normal. Plaintiff had no (real) choice but to accept these terms.

22.     Plaintiff worked for Defendants from November 1, 2021 through August 31, 2022.

23.     On December 9, 2021, at a social event with the Company, Mr. Carnes sat very close to Plaintiff and began interrogating her about her love life and partners.

24.     Uncomfortable with Mr. Carnes' demeanor and barrage of inappropriate questions, Plaintiff repeatedly attempted to change the topic, but Mr. Carnes refused to let up.

25.     Unable to evade Mr. Carnes - her boss and the Company's COO – Plaintiff disclosed that she had a Turkish boyfriend with whom she lived.

26.     In response, Mr. Carnes argued that "only dating international people" was a problem for her and her visa, suggesting that she needed to date American citizens (which, of course, Mr. Carnes is) for things to go smoother.

27.     Although Plaintiff did not want to continue discussing her personal life with Mr. Carnes or entertain what appeared to be his sexual proposition, she was bothered by his insinuation that she discriminated in her dating life and disclosed that she was in an open relationship with her Turkish partner and went on dates with an American citizen.

28.     Upon hearing about Plaintiff's open relationship, he became obsessed with her personal life and zealously accused her of having too many boyfriends and being afraid of monogamous relationships with men.

29.     Mr. Carnes emphasized monogamy was the hardest part of his ten-year relationship with his spouse, appearing to make another sexual overture.

30.     Miserably failing to obtain anything beyond a work relationship from Plaintiff, Mr. Carnes explicitly warned Plaintiff not to discuss her love life - especially her open relationship and the fact that she was dating more than one man at a time - with Mr. Mallick, stressing "He will not understand or be okay with any of this. Just don't tell him."

31.     In the ensuing months, Plaintiff witnessed Mr. Carnes acting inappropriately at work, including acting flirtatious towards female subordinates and otherwise making them feel uncomfortable with the way he conducted himself.

32.     Indeed, during weekly zoom meetings with Mr. Carnes in January 2022, he made many flirtatious, suggestive remarks to Plaintiff, including repeatedly commenting how charming she was and how she could get whatever she wanted from people if she did what was necessary. He stressed that he had hired her because of how charming she was.

33.     As it was customary for managers to have work lunches with their direct reports, on February 2, 2022, Plaintiff had one with Mr. Carnes.  Unfortunately, because of Mr. Carnes, this lunch was anything but customary or professional.

34.     During the lunch, Mr. Carnes talked a considerable amount about his family.  In particular, Mr. Carnes discussed his brother's girlfriend who he and his family do not approve of because she is "very liberal" and has a stripper pole in her apartment, emphasizing that women like her are not marriage material and that his brother was most likely with her just for "the sex."

35.     Not content with disparaging his brother's girlfriend based on deplorable stereotypes and sexist beliefs, Mr. Carnes asked Plaintiff about her significant other as well as what she likes in men, which, once again, made Plaintiff uncomfortable.

36.     After learning that Plaintiff had broken up with her partner, Mr. Carnes went out of his way to complain about his marriage and express buyer's remorse, claiming that he had gotten married too young, that he didn't have the same feelings for his wife and was otherwise not attracted to her anymore, that his wife was pushing him to have kids, and, most notably, that he didn't believe the marriage was going to last.

37.     At the end of the lunch, Mr. Carnes told Plaintiff that he wanted to go out with her more often and would always make himself available to go out to eat and have drinks, so long as she never told anyone they were going out, a clear acknowledgment that he was abusing his power and behaving inappropriately.

38.     On February 4, 2022, Mr. Carnes continued calling Plaintiff charming and acting flirtatious and inappropriate, but, as always, she never reciprocated his advances.

39.     On February 5, 2022, management took various employees out for drinks.  While at a rooftop bar, Mr. Carnes asked Plaintiff if she wanted "a mint" from a metal box he was holding. Believing it to only be a mint, she took it and chewed it quickly.

40.     Someone quickly warned Plaintiff that the mint had drugs in it and that she should try to spit out.  Although Plaintiff had finished most of the mint, she proceeded to frantically spit out any remnants and picked at her teeth using her fingernails to remove all traces.

41.     Regardless of whether the drug had marijuana, another more serious and lethal drug, or a combination of these, Plaintiff had previously informed Mr. Carnes that she didn't do drugs like Marijuana, stating "it will take me straight to the hospital."

42.     Despite knowing this, Mr. Carnes drugged Plaintiff against her consent, which, in conjunction with his ongoing sexual behavior, revealed deeply sinister and disturbing motives.

43.     Making matters worse, Mr. Carnes didn't apologize or even attempt to explain himself for what he had done to her, demonstrating this had been no accident.

44.     On March 24, 2022, Plaintiff had a Zoom call with both Mr. Carnes and Mrs. Mallick.  During the call, Mr. Mallick informed Plaintiff that she was being demoted and would no longer report to any of the founding owners/executives of the Company.

45.     Mr. Mallick stated that his decision was due to Plaintiff allegedly repeating comments Mr. Carnes had made to her during a conversation about monogamy and relationships. Mr. Mallick stressed that the decision had nothing to do with Plaintiff's performance.

46.     In other words, Mr. Mallick found out about Plaintiff's open relationships and, as she had been previously warned, Mr. Mallick did not approve in the slightest and was punishing her for it, something he would never do to a male employee.  Notably, Mr. Mallick was not punishing or reprimanding Mr. Carnes for his inappropriate behavior.

47.     Plaintiff quickly defended herself saying that she had done nothing wrong, that Mr. Carnes had been inappropriate with his comments and behavior since December, and that she did not feel comfortable being questioned by her male bosses about her personal life, including who she dates and why.

48.     In direct response to Plaintiff complaining about discriminatory behavior and reporting Mr. Carnes, Defendants started overloading her with work.

49.     Then, in an effort to monitor Plaintiff at all times and cut her interactions with co-workers, Defendants prohibited her from posting anything in slack chats with the operations group without first receiving Mr. Carnes' approval.  Freely posting in these slack chats was an invaluable

asset to performing Plaintiff's job her as it permitted her to post recommendations and action items to improve operations.

50.     Unsurprisingly, Mr. Carnes frequently ignored Plaintiff's proposed posts for the slack chats, further marginalizing her at work and making her job considerably harder.

51.     During the first few days of April 2022, Defendants stated that they would investigate Plaintiff's allegations against them; in reality, and true to form, they did nothing of substance, certainly nothing that corrected Defendants' prior wrongs or prevented future issues.

52.     On April 5, 2022, Mr. Mallick informed Plaintiff that they would be changing her job and drastically increasing her responsibilities and workload.

53.     On April 7, 2022, Defendants advised Plaintiff that they had concluded their so-called investigation and that Plaintiff and Mr. Carnes would continue working each other.

54.     On April 21, 2022, Plaintiff spoke to Mr. Carnes regarding the progress of her O-1 visa.  During the meeting, Mr. Carnes confirmed that Defendants had never started the process for Plaintiff's O-1 visa, even though they had promised to do so as soon as Plaintiff started her employment.

55.     Significantly, Mr. Carnes stated that Defendants had never started the O-1 visa application due to ongoing investigations into Plaintiff and being unsure whether she was still an employee in "good standing", purposely endangering Plaintiff's legal status in this country and continuing to shamelessly retaliate against her.

56.     Mr. Carnes made clear that Plaintiff's performance had nothing to do with Defendants' decision to delay her immigration paperwork.

57.     As a convenient solution for the problem that Defendants purposely created, Mr. Carnes pressured Plaintiff into obtaining a student visa – entirely at her expense.  Left with no

other recourse and concerned with deportation, Plaintiff enrolled in a Master's program to obtain a student visa, a very costly process.

58.     In the ensuing weeks, Defendants constantly changed and expanded Plaintiff's role and responsibilities and threatened to further change her role and reporting structure, adding stress and anxiety to her inescapable hostile work environment.

59.     In fact, during the first three weeks of May 2022, Mr. Carnes repeatedly warned Plaintiff that Defendants no longer had a business need for her job.

60.     Plaintiff replied that she felt that she was being targeted due to her prior discrimination complaints, as opposed to any legitimate business reason, and demanded to speak again to Mr. Mallick.

61.     On May 20, 2022, Plaintiff had an in-person meeting with Mr. Mallick and Mr. Carnes, during which she accused Defendants, *inter alia*, of sexual harassment and retaliation and advised them that she intended to sue them for discrimination if the situation did not improve.

62.     On May 27, 2022, Mr. Mallick advised Plaintiff *via* email that her role was being phased out and that she would no longer be reporting to founders of the Company, a *de facto* demotion.

63.     In response, Plaintiff accused them of "sexual harassment and discrimination episodes" reasoning "I have gone through very bad experiences that would not have otherwise taken place if I was not a woman, Latina, and Peruvian. I am the only person going through reporting changes in the company, not to mention that sadly I have been constantly put under stress with multiple insinuations of my role being reassigned.."

64.     On July 5, 2022, Plaintiff's legal counsel sent a letter to Defendants' representatives informing them that she intended to sue them for employment discrimination.

65.     In direct retaliation for her complaint, on July 7, 2022, Defendants placed Plaintiff on administrative leave, further excluding and humiliating her at work.  Plaintiff remained on administrative leave for the remainder of her employment.

66.     Despite Plaintiff's numerous, good-faith attempts to address her discrimination complaints with Defendants, they continued threatening her employment, leaving clear that they were only interested in eliminating her and sweeping things under the rug.

67.     In fact, on July 15, 2022, Defendants boldly threatened to investigate Plaintiff for "insubordination", extend Plaintiff's administrative leave, and terminate her employment.

68.     From that day through September 2022, Plaintiff repeatedly accused Defendants of discriminating and retaliating against her and looking for any pretext to unlawfully terminate her.

69.     Not only that, Plaintiff filed and served a demand for arbitration against Defendants for discrimination and retaliation under NYCHRL - for causes of action not covered by the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021", if any.

70.     In direct response to Plaintiff's continuous protected activity and due to her protected classes, on August 30, 2022, Defendants informed her that her employment was terminated effective the next day.

71.     On September 8, 2022, Plaintiff wrote an email to Defendants accusing them of "still looking for bogus way to justify all the illegal things you have been doing to me."

72.     On September 9, 2022, Defendants responded to her email, clarifying that her employment was terminated effective immediately, even though they had already fired her.

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
#### Discrimination Under New York City Human Rights Law

73.     Plaintiff repeats, reiterates and reasserts all allegations contained in the preceding paragraphs of complaint as if fully set forth herein at length.

11

74.     Defendants engaged in unlawful discriminatory practices in violation of NYCHRL by discriminating against Plaintiff based upon her gender (sex), race, national origin (and/or immigration status), and ethnicity, sexual harassing her; by subjecting her to a pervasive and actionable hostile work environment; and unlawfully terminating her employment.

75.     As a direct and proximate result of the Defendant's' actions, Plaintiff has suffered and continues to suffer substantial losses in an amount to be proved at trial.

76.     Therefore, Plaintiff is entitled to all remedies and relief afforded by NYCHRL, including but not limited to, back pay, front pay, emotional distress, punitive damages, attorney's fees and costs, all injunctive relief, and any other remedy or relief that is available under the law.

### SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
#### Retaliation Under New York City Human Rights Law

77.     Plaintiff repeats, reiterates and reasserts all allegations contained in the preceding paragraphs of this complaint as if fully set forth herein at length.

78.     Defendants retaliated against Plaintiff for complaining about unlawful discrimination, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

79.     As a direct and proximate result of the Defendants' actions, Plaintiff has suffered and continues to suffer substantial losses in an amount to be proved at trial.

80.     Therefore, Plaintiff is entitled to all remedies and relief afforded by NYCHRL, including but not limited to, back pay, front pay, emotional distress, punitive damages, attorney's fees and costs, all injunctive relief, and any other remedy or relief that is available under the law.

### THIRD CLAIM FOR RELIEF AGAINST MALLICK AND CARNES
*Aiding and Abetting Under New York City Human Rights Law*

81.    Plaintiff repeats, reiterates and reasserts all allegations contained in the preceding paragraphs of this complaint as if fully set forth herein at length.

82.    The NYCHRL provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

83.    Mr. Mallick and Mr. Carnes violated the section cited herein by aiding, abetting, inciting, compelling, and/or coercing the above discriminatory and unlawful conduct.

84.    Therefore, Plaintiff is entitled to all remedies and relief afforded by NYCHRL, including but not limited to, back pay, front pay, emotional distress, punitive damages, attorney's fees and costs, injunctive relief, and any other remedy or relief available under the law.

### DEMAND FOR A JURY TRIAL

85.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury in this action

### *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiff prays judgment against the Defendants, and each of them:

a.    Awarding future income to Plaintiff in an amount to be proven at arbitration, representing all loss of future earnings, including reasonable and expected increases, loss of retirement income, and all other benefits he would have expected to earn during her entire lifetime had it not been for Defendants' unlawful discrimination;

b.    Awarding general damages (including backpay) to the Plaintiff to make her whole for any losses suffered as a result of such unlawful employment practices;

c.    Awarding Plaintiff compensatory damages for mental and emotional distress, pain and suffering as well as injury to her reputation in an amount to be proven at arbitration;

d.    Awarding Plaintiff punitive damages;

e.  All damages that Plaintiff has sustained as a result of Defendants' conduct, including all unpaid wages and any shortfall between wages paid and those due under the law that Plaintiff would have received but for Defendants' unlawful payment practices;

f.  Any statutory remedy and penalties recoverable under NYCHRL.

g.  Awarding Plaintiff attorneys' fees, disbursements, costs and expenses incurred in the prosecution of the action, under NYCHRL;

h.  Awarding all relief, remedies, and damages available to Plaintiff under the law; and

i.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated:  New York, New York
         September 12, 2022

**LAW OFFICES OF WILLIAM CAFARO**

_____
Louis M. Leon, Esq. (LL 2057)
*Attorneys for Plaintiff*
108 West 39th Street, Ste. 602
New York, New York 10018
Tel: (212) 583-7400
Email: lleon@cafaroesq.com